THE PEOPLE OF THE STATE OF NEW YORK ex rel. ROBERT U. WINSPEAR, Relator, *v.* ARTHUR W. KREINHEDER, Acting Mayor of the City of Buffalo, N. Y., and Others, Respondents.

Fourth Department, July 1, 1921.

Municipal corporations — certiorari to review proceedings of acting mayor of city in demoting police captain — qualifications of acting mayor who was personally interested — charges that relator violated rules of police department not sustained — relator reinstated.

In certiorari proceedings before the acting mayor of the city of Buffalo to review the trial of a police captain which resulted in the captain being demoted to the rank of patrolman, it appeared that the counsel for the

relator objected to proceeding to trial before the acting mayor on the ground that he was disqualified because the charges in part, at least, arose out of personal controversies between the accused and the acting mayor. *Held,* that while in cases of this character a person shall not sit as judge in a case where he is interested, the evidence produced is hardly sufficient to make the case one of absolute disqualification.

Where an official's qualifications to hear the charges are questioned, and where he may be a witness to material facts on the trial and he is without judicial experience or training, his insistence upon presiding at the trial himself makes necessary a more critical examination of the evidence to determine whether or not the official presiding has, consciously or unconsciously, been influenced by his personal interest in the controversy.

On all the evidence, *held,* that the charges that the relator failed to obey certain rules of the police department in preparing and presenting charges against a patrolman in his precinct, as he was ordered to do by the chief of police, were not sustained.

Likewise the charge that he gave an interview to a newspaper wherein he censured the acting mayor, contrary to the rules of the department, was not sustained by the evidence.

The fact that the relator sent a letter directly to the acting mayor, which he desired him to read, in violation of the rule of the department that all communications must be made through the office of the chief of police, did not justify the relator's demotion to the rank of patrolman, and he should be reinstated.

CERTIORARI issued out of the Supreme Court and attested on the 11th day of November, 1920, directed to Arthur W. Kreinheder and others, commanding them to certify and return to the office of the clerk of the county of Erie all and singular their proceedings had in reducing Robert U. Winspear from the rank of captain of police to the rank of patrolman, and assigning him to duty as patrolman in the eleventh precinct in the city of Buffalo.

*Kent, Cummings & Means* [*Ralph S. Kent* of counsel], for the relator.

*William S. Rann, Corporation Counsel* [*Frank C. Westphal* of counsel], for the respondents.

DAVIS, J.:

The relator is a captain of the third police precinct of the city of Buffalo. On October 20, 1920, charges were formally preferred against him by the chief of police. A trial was had

before the acting mayor, beginning ·on November fourth, and a decision was made November eleventh, finding the relator guilty of the charges; and he was punished by being reduced from the rank of captain to that of patrolman.

The first question presented involves the right of the acting mayor to hear and to sit in judgment on the charges preferred against the relator. The counsel for the relator objected to proceeding to trial before the acting mayor on the ground that he was disqualified, because the charges in part, at least, arose out of personal controversies between the accused and the acting mayor, and the latter had prejudged the case; and in effect the charges were being tried before the man who instigated them.

There is ample authority in cases of this character that a person shall not sit as judge in a case where he is interested, and that the accuser may not also be the judge. (*People ex rel. Hayes* v. *Waldo,* 212 N. Y. 156; *People ex rel. Pond* v. *Trustees,* 4 App. Div. 399; *People ex rel. Miller* v. *Elmendorf,* 51 id. 173.)

But the evidence produced is hardly sufficient to make a case of absolute disqualification. The rulings on the admissibility of evidence were apparently free from bias and made in a spirit of fairness. But the facts developed as to personal controversies between the acting mayor and the relator in relation to the charges, and the cross-examination of the latter by the former as to transactions involving a question of veracity between them, are sufficient to indicate that the atmosphere of the trial was not what we ordinarily expect when a just decision is reached.

There were other disinterested officials to whom the duty of passing on these charges might have been delegated. And where an official's qualifications to hear the charges are questioned, and where he may be a witness to material facts on the trial and he is without judicial experience or training, his insistence upon presiding at the trial himself, makes necessary a more critical examination of the evidence to determine whether or not the official presiding has consciously or unconsciously been influenced by his personal interest in the controversy.

Stripped of their technical language the charges (five in

Fourth Department, July, 1921.　　[Vol. 197

number) in brief are as follows: That the relator failed to obey certain rules of the police department in preparing and presenting charges against Officer Obertean, a patrolman in his precinct, as he was ordered to do by the chief ·of police (two of the charges cover this same subject); that he gave an interview to a newspaper wherein he censured the acting mayor, contrary to a rule of the department; that the ·chief of police received a letter containing a complaint which he sent to the relator with directions to investigate the statements in the letter and report thereon, and that he failed and neglected to so investigate and report, but caused the letter to be delivered to the acting mayor, in violation of the rules; and that the sending of said letter directly to the acting mayor, without having the communication passed through the immediate commanding officer, was a violation of another rule of the department.

This simple statement of the charges indicates that they are in their nature of the most technical and unsubstantial character. Speaking generally, there is nothing in them that pertains to inefficiency, misconduct or corruption in the performance of police duty. At best they represent a breach of certain rules of the department. It does not appear how many rules there are for the government of the department, but one offered in evidence is No. 518. It ought not to be difficult at any time to discover a technical violation of one or more of these numerous rules. The charges were made against a man who had an excellent police record for upwards of nineteen years, during which time he had risen from patrolman to captain. These facts, taken in connection with the severe punishment visited on the relator, naturally arrest attention and invite inquiry into the circumstances leading to such result.

Some reasons are not far to seek. The relator was captain of what is known as the " vice squad," and in his district were located the greater number of the disorderly houses of the city. He was appointed as captain of that precinct by the predecessor of the acting mayor, to wipe out the lawlessness of the district, and he· was evidently diligent in the performance of that duty. But he seems to have differed with one temporarily in superior authority as to the methods

of dealing with vice and incurred his displeasure. There is little doubt from the evidence that the acting mayor believed that the correct method of dealing with the social evil was by segregation of these lawless elements in districts, which, of course, could not be done without express or implied relaxation of law enforcement; and that Captain Winspear believed in ceaseless attacks on vice wherever found. They represented two conflicting ideas engaged in a never-ending struggle in municipal government — the so-called "liberal" policy which recognizes that vice and crime must always exist and should be temporized with, and the policy of strict enforcement which believes in unceasing war on the criminal and vicious elements in society. There is no harmony to be had between these schools of thought. There can be no reasonable doubt that the charges against the relator grew out of this conflict of ideas.

The facts relative to the charge against Patrolman Obertean are, briefly, these: Obertean was a member of the vice squad with a good record. He became involved in an altercation with some men at a restaurant in his district. These men wrote out some statements charging that Obertean was intoxicated and committed an assault upon them, and these unverified statements came into the hands of the chief of police. He sent them in a sealed envelope by messenger to Captain Winspear. They were left on his desk, the captain being absent at the time. He did not receive them until the next day, and it appears that the envelope had been opened and some of the statements taken out before they reached his hands. By whom they were taken does not appear. It is claimed that there was some indorsement on these papers directing the relator to prepare and present charges against Obertean, but the relator claims that indorsement was on no papers that came into his actual possession. He immediately began an investigation as to the truth of the charges. He learned that two of the men making the charges were convicted criminals, one having been convicted of a felony; another was a man of apparently no character. From independent witnesses he ascertained that Obertean was not intoxicated, and on the subsequent trial before the acting mayor, Obertean was acquitted of that charge. As to whether

or not the assault charged was a justifiable one does not sufficiently appear. Within two days from the time relator actually received them, the chief of police recalled the papers, and the charges were preferred against Obertean by an inspector who had co-ordinate authority. The chief testifies that he never directed the relator to prepare the charges. He would have been entitled to a reasonable time to investigate the matter and prepare the charges which he must sign and verify upon oath, and this charge of neglect of duty as preferred is not supported by the evidence.

The charge relative to the interview in the newspaper has even less substantial foundation. After Winspear had been suspended and before charges were actually preferred, and while the whole matter was a subject of public interest in Buffalo, an official of a Sunday newspaper called Winspear's residence on the telephone and asked for a photograph which they might publish in connection with the interesting developments in the police department, and said that he would send a messenger for it. Shortly thereafter an eighteen-year-old boy appeared at Winspear's home and there was some discussion about the photograph. There was a few minutes conversation between him and Captain Winspear relative to the police situation, during which no notes were taken, and the boy departed with the photograph. Subsequently he and another man, who was not present, wrote up an account of the friction in the police department, and assumed to quote Captain Winspear. This article was revised by still another man and was finally printed. Evidence that the relator gave out an interview criticising his superiors is entirely lacking.

The other charges have to do with a raid made by Captain Winspear on the Victoria Hotel, which it was charged was a house of assignation. The clerk and twelve inmates pleaded guilty to criminal charges, and thus justified the raid. Some unknown citizen wrote a letter to the chief of police commending the police for raiding this place, and stating that many people were inquiring why they did not raid Heinike's Hotel, which he claimed to be a place of the same character. This letter the chief of police sent through an inspector to Captain Winspear, with directions to investigate. There had been some controversy between the acting mayor and the

captain relative to these places, and as to the methods the latter was employing in closing them. Apparently the captain desired to call to the acting mayor's attention the fact that there was some public approval of his methods, so he sent an officer with the letter to the acting mayor with a note of his own, asking the latter to read it as a matter of interest to him, and to then return it by the bearer so that the matter could be investigated. The acting mayor apparently became angry and kept the letter. The evidence is that the relator proceeded with his investigation, and there is no foundation for the charge that he failed and neglected to make the investigation ordered by the chief of police.

But the learned counsel for the respondents says that the last charge is the most important of all, and that under the rules of the department, if the relator wanted the acting mayor to see the letter, he should have sent it back through the office of the chief of police, and in calling it directly to his attention he grievously offended against the rule and discipline of the department. This may have been a technical violation of the rule, although it is doubtful if it was intended to apply to an incident of this nature. It undoubtedly is intended to apply to formal official communications. Very likely it would have been a similar violation if the captain, with the letter in his pocket, had shown it to the acting mayor had they met on the street. But the charge is technical and trivial, and even in military life a commanding officer who would reduce to the ranks a subordinate with a long record of faithful service for such a slight infraction of military discipline, would be deemed a martinet. All the punishment that such an offense would merit would be a reprimand, or at most a fine of a few days' pay. There was apparently no conscious violation of any rule or omission of any duty on the part of the relator, and it is hardly worth while to engraft such rigid military rules upon our civil system, even in a department semi-military in its character.

In *People ex rel. Devaney* v. *Greene* (89 App. Div. 296, 299) WOODWARD, J., says: " While it is true that the statute vests the discretion in the police commissioner of determining the punishment, it is hardly possible that the Legislature intended that the extreme penalty should under ordinary

circumstances be visited upon a police officer for a mere technical violation of a rule which is not shown to have prejudiced any rights of the public or interfered with the proper discipline of the department." (See, also, *People ex rel. Gannon* v. *McAdoo*, 117 App. Div. 438; *People ex rel. Brennan* v. *Bingham*, 130 id. 710.) And in *People ex rel. Shires* v. *Magee* (57 App. Div. 281, 283) SMITH, J., says: " The counsel for the defendant has pressed upon our attention the argument that this conviction should be sustained in order to maintain the discipline of this commissioner in the police force. The importance of such discipline is recognized. Far more effective to maintain such discipline, however, would be fair and impartial action on the part of the commissioner, than to sustain a conviction, unwarranted either by law or by fact."

We have reached the conclusion that the facts established on the trial did not warrant the findings made by the acting mayor or his determination that the relator should be punished by reduction in rank. The findings of fact made by him are, therefore, disapproved, as is his conclusion that the relator was guilty of all the charges.

Having reached a conclusion on the merits, it is unnecessary to consider the question raised by the relator's counsel, whether the procedure adopted in making the charges was regular in respect to the time in which they should be preferred after the order was made suspending relator.

The determination of the acting mayor should be annulled and the relator reinstated, with costs.

All concur, HUBBS, J., in result only.

Writ of certiorari sustained, determination of the acting mayor annulled, and relator reinstated, with fifty dollars costs and disbursements.