In the Matter of Philip F. Ryan, Petitioner, against New York State Liquor Authority, Respondent.

Third Department, May 5, 1948.

*Keniry & Nolan*, attorneys for petitioner.

*Nathaniel L. Goldstein, Attorney-General (Wendell P. Brown, Solicitor-General, John R. Davison* and *Ronald E. Coleman, Assistant Attorneys-General,* of counsel), for respondent.

RUSSELL, J. This is a proceeding under article 78 of the Civil Practice Act to review a determination of the State Liquor Authority removing petitioner from his position as "Executive Officer" of the Saratoga County Alcoholic Beverage Control Board to which he was appointed on the 29th day of April, 1940.

On July 18, 1946, petitioner was dismissed by the State Liquor Authority. The determination was made as a result of a hearing held and at which evidence was taken pursuant to statutory direction. This determination was annulled by this court and the matter remitted to the State Liquor Authority for such other proceedings as it may deem proper. (271 App. Div. 861.)

The respondent made in writing thirteen charges against the petitioner on the original hearing.

The determination under review was made after reconsideration by the commissioners of the State Liquor Authority of the testimony taken at the original hearing upon the charges as made. No further evidence was taken. Said determination under review is based upon new findings made by the authority by which it found the petitioner guilty of all the charges made against him except charge No. 3 and charge No. 7. The petitioner served in and was honorably discharged from the United States Army after World War I.

Pursuant to section 22 of the Civil Service Law the burden of proving the petitioner's incompetency or misconduct rested upon the person alleging the same. The State Liquor Authority initiated the charges against the petitioner and designated one of its employees to take the proof against him. The substance of all the charges, except 10 to 13, was to the effect that Ryan directly or indirectly solicited or attempted to influence four retail licensees of alcoholic beverages in Saratoga County to remove from their premises an automatic coin operated music box and replace the same with a box distributed by one Paul F. Taglione, and that the petitioner allowed Taglione to accompany him to the licensed premises of the different licensees for the

purpose of soliciting or inducing the licensee to install in his premises an automatic coin operated music box distributed or owned by Taglione, or by a corporation in which he was directly or indirectly interested. Taglione was an honorably discharged World War II veteran with the rank of captain. The petitioner and Taglione were members of the American Legion Post at Mechanicville and it was during the evening of Taglione's initiation into the American Legion that Ryan and he became acquainted.

Charges 10 to 13 accused Ryan of having conducted himself in such a manner as to impair the good order, efficiency and discipline of the State service, as to reflect discredit upon the State service, and as to destroy confidence in his loyalty, integrity and fitness to be continued in his employment.

The State Liquor Authority relies upon the evidence of the aforesaid licensees, who were Winslow, Scherer, Phillips, Plude and DeGraff. It appears that on the afternoon of March 21, 1946, while Taglione was repairing a machine located at a grill on the Saratoga-Corinth highway, he was informed by the owner that she had purchased it from Beecher Winslow and suggested to Taglione that he see Winslow. Taglione had difficulty in finding Winslow's place. He stopped at Scherer's gas station to make inquiries about Winslow's place and there accidentally met the petitioner. The conversation resulted in an introduction of Taglione to Scherer by Ryan. Ryan at this time was investigating the place that had come to his attention with respect to veterans, from the Mt. McGregor State Hospital at Wilton, who had become intoxicated, stolen an automobile and were severely injured.

In considering the evidence in this case, consideration must be given first — whether, in making the determination, any rule of law affecting the rights of the parties thereto has been violated to the prejudice of the petitioner. Second — whether there was any competent proof of all the facts necessary to be proved in order to authorize the making of the determination, and third — if there was such proof, whether, upon all the evidence, there was such a preponderance of proof against the existence of any of those facts that if the finding had been made by a jury it could be set aside by the court as against the weight of evidence. (Civ. Prac. Act, § 1296.)

At the time Winslow was introduced to Taglione by Ryan, Winslow testified as follows: " Q. And do you remember what he [Ryan] said? A. Why, he introduced me to this fellow [meaning Taglione] and he said, ' My boss is in the juke box

business.' That's what Mr. Ryan said. That's all he said. Q. That's all that Mr. Ryan said? A. Yes." A great deal of stress is placed by the Liquor Authority upon this statement " My boss is in the juke box business." At the time Taglione was introduced to Winslow the bar was crowded and Taglione's evidence reveals the introduction as follows: Mr. Ryan said, " This is Mr. Taglione. He tells me he is the boss of the Wurlitzer machines in the county here ". Most of Winslow's evidence relied upon by the Liquor Authority resulted only in an impression which he, Winslow, entertained that Ryan was in the juke box business which is clearly demonstrated by the following questions and answers: " Q. And did you get the impression from your conversation that night and what happened that if you had Taglione's box in you would be on the right side. Is that right? A. Well, you know, I figured if the A.B.C. Board was in the juke box business I had better have this same make. * * * Q. By the A.B.C. Board, did you mean the Saratoga County Board or the State Board? A. No — in general. Q. Either one? A. Yes. Q. You didn't know which one? A. No." The absurdity of such testimony is clearly demonstrated by the willingness of Winslow to testify to anything that he thought the Liquor Authority would want by the following question and answer when questioned by the State investigators: " Q. Well, if you were worried about losing your license by reason of this music box incident, weren't you more excited or worried about losing your license when Mr. Robertson questioned you for an hour in your place and then another half hour in Albany? A. No, I didn't worry about that reason. I had a thought I'd tell anything they wanted me to tell to save my own hide."

The evidence of the conversation of the transaction between Ryan and Plude is shown by the evidence to be so uncertain that it carries with it no weight whatever except leaving the impression in the minds of Plude and Phillips that Ryan desired them to install a music box of the make on the name of the card. The card in question was alleged to have been given by Ryan to Plude with the name Mercury Music Box Company on it. This is denied by the petitioner. The evidence as a whole concerning this transaction is extremely doubtful.

The evidence of Mr. and Mrs. Scherer also is clouded in uncertainty. When Mr. Scherer returned from Florida he had a conversation with Mr. Ryan about which he was examined. At that time he could not recall any conversation with reference

to a music box or a juke box. Later on it appears in the evidence that he gained the impression that Mr. Ryan wanted him to take a juke box from Taglione. The same impression was entertained by Mrs. Scherer. The strongest evidence by Mrs. Scherer appears to be in the statement "Mr. Ryan * * * asked me if I would put in another nickelodeon in the place" and later she testified that Mr. Ryan told her not to change, to keep the nickelodeon. Such contradictory statements appear to render any accusation on the Scherers' part as void of any weight whatever.

In DeGraff's place of business, Ryan introduced Taglione to DeGraff, at which time Taglione and DeGraff had a conversation about a music box. Ryan was present, but took no part in the conversation. DeGraff gained the impression that he should change distributors, because Taglione was a friend of Ryan. However, he did not change distributors and said he would not consider it. DeGraff's evidence reveals the fact that it was through his conversation with Winslow and the Scherers that the accusations against Ryan ripened to a great extent into the charges. Mrs. Scherer testified that DeGraff came into her place and started prancing up and down on the floor and said, " ' You'll either switch over or it's going to cost you a lot of money.' I said, ' It ain't going to cost me a penny.' I said, ' Phil Ryan wouldn't do anything like that.' " Then it appears that DeGraff said, " Well, it's going to happen because he didn't put the gun to me but that was all." This story Mrs. Scherer later on denies in part. After DeGraff had made these statements to Mrs. Scherer, Mr. Scherer became somewhat alarmed and telephoned Mr. Ryan, at which time Mr. Ryan went and had a talk with Mr. Scherer. The following conversation took place, to which Mr. Scherer testified as follows: " I said, ' Have you heard what's going on ?' He [Ryan] said, ' What? ' He was surprised to hear it and I told him all about it so he came in and he said, ' Do me one favor. If this guy comes up here with a juke box, don't change and I wish they all do the same thing.' "

The hostility of DeGraff towards Ryan can be accounted for by the fact that Ryan inspected his place of business to see if he had followed a direction from the State Liquor Authority to remove shades from his windows, and also from the fact that he was questioned by Ryan for purchasing liquor in a liquor store in Saratoga Springs for the purpose of purchasing it illegally and selling it in bottles to veterans at the State Mt. McGregor Hospital. When Winslow was further questioned about his conversation with DeGraff, his estimation of DeGraff

appears in the following question and answer: " Q. In other words, he is a man that rants and raves around the community. Is that so? A. Yes." He further stated that DeGraff is " sort of radical. I never take him too seriously."

An examination of the evidence is convincing that the determination made by the Liquor Authority was arrived at upon conclusions of witnesses and hearsay testimony. In disciplinary proceedings before an administrative officer or officers it is recognized that some latitude must be allowed as to the rules of evidence and the methods of examination, " but no essential element of a fair trial can be dispensed with unless waived, and no vital safeguard violated without rendering the judgment of conviction subject to reversal upon review." (*Matter of Roge* v. *Valentine*, 280 N. Y. 268, 279.)

Witnesses should be confined to facts and not to their opinions, conclusions or inferences. (*Ferguson* v. *Hubbell*, 97 N. Y. 507, 512; *Morehouse* v. *Mathews*, 2 N. Y. 514, 515.)

Even assuming from all the testimony taken in this proceeding that Ryan committed an error of judgment in introducing a friend of his to the licensees for the purpose alleged in the charges, nevertheless, a single error of judgment was not sufficient evidence to warrant his removal. (*People ex rel. Long* v. *Whitney*, 143 App. Div. 17, 19.)

" A mere technical breach of the rules without wrongful intent is not sufficient to warrant the discharge of an officer with a record of faithful service ". (*People ex rel. Rigby* v. *Anderson*, 198 App. Div. 283, 285; *People ex rel. Winspear* v. *Kreinheder*, 197 App. Div. 887.)

The deputy commissioner, who conducted the hearing, stated in his report to the respondent " there is no evidence that Ryan was interested directly or indirectly in Taglione, his corporation, or any other corporation, or that Ryan would in any way benefit if the Licensees installed new music boxes controlled and distributed by Taglione."

The entire evidence is founded mainly on suspicions. Very often suspicions arise from hidden sources and little knowledge void of facts.

The petitioner is a man fifty years of age and throughout his life held many offices of public trust. Certainly a man's unblemished record for life and excellent reputation for integrity, supported by nine citizens of high moral and civic standing, should have great weight against accusations founded upon suspicions and impressions, suspicions of such a nature that they carry no convincing weight.

The evidence fails to sustain any of the charges enumerated in specific language and also charges 10 to 13 framed in general language.

The findings sustaining charges 1, 2, 4, 5, 6, 8, 9 and 10–13 should be annulled. The determination of the respondent should be annulled and the charges against the petitioner dismissed, with costs.

HILL, P. J., HEFFERNAN, BREWSTER and DEYO, JJ., concur.

Determination of the respondent annulled on the law and facts and the charges against the petitioner dismissed, with $50 costs.

The findings sustaining charges 1, 2, 4, 5, 6, 8, 9 and 10–13 annulled.